# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE POLYESTER STAPLE | ) | |
| ANTITRUST LITIGATION | ) | **MDL DOCKET NO: 3:03CV1516** |
| _____ | ) | **ALL CASES** |

## Order DENYING Rule 12(b)(2) Motions To Dismiss Filed By Defendants Hoechst GmbH and Celanese AG

**THIS MATTER** comes before the Court upon multiple motions to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure alleging lack of *in personam* jurisdiction filed on behalf of foreign entities, Defendants Hoechst GmbH (f/k/a and sued herein as Hoechst Aktiengesellschaft) (referred to herein as "Hoechst AG") and Celanese Aktiengesellschaft (referred to herein as "Celanese AG").[1] The instant Memorandum and Order addresses the following motions: 1) Hoechst AG's Motion To Dismiss Avondale's Second Amended Complaint (Individual Action No.: 3:03CV296 / Document #54); 2) Hoechst AG's Motion To Dismiss Parkdale Plaintiffs' Complaint (Individual Action No.: 3:06CV390 / Document #25); 3) Hoechst AG's Motion To Dismiss Burlington Industries Plaintiffs' Amended Complaint (Individual Action No.: 3:06CV387 / Document #48); and 4) Celanese AG's Motion To Dismiss Burlington Industries Plaintiffs' Amended Complaint (Individual Action No.: 3:06CV387 / Document #45-2). The Court has considered Defendants' motions and all related memoranda and exhibits. This matter is ripe for disposition by the Court.

---

[1] A separate Memorandum and Order will address Defendants' alternative bases for dismissal / partial summary judgment.

# I.  Background

These actions arise out of allegations by various Individual or Non Class Plaintiffs ("NCPs") that as early as 1995, and continuing through 2001, Defendants and their co-conspirators agreed, combined and conspired with each other to fix, raise, maintain and / or stabilize the price of polyester staple and to allocate markets and / or customers for the sale of polyester staple in the United States.[2] Plaintiffs allege that as a result of Defendants' unlawful conduct and conspiracy, Plaintiffs paid artificially inflated prices for polyester staple.  Plaintiffs assert that Defendants violated Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 1 of the Sherman Act, 15 U.S.C. §1. Plaintiffs seek injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees.

Many of the Individual or NCP Actions within MDL 1516 mirror the direct purchaser class action except that the Class Plaintiffs defined the class period more narrowly and did not seek redress from any of the Hoechst Celanese Defendants.  Five of these Individual or NCP Actions have been pending since 2003.[3]  The NCPs who participated in these consolidated multi-district proceedings prior to the Fall of 2006 reached settlement agreements with the other alleged Co-Conspirator Defendants, including the Arteva / KoSa Defendant group, the DAK Defendants, Wellman, and the Nan Ya Defendants.

---

[2] In addition to the Individual or Non Class Plaintiffs' actions, these consolidated multidistrict proceedings encompass a class action that remains pending against the Arteva / KoSa Defendants.  The class represents *only* direct purchasers of PSF.  The class action is scheduled for jury trial beginning March 28, 2008.

[3] The remaining NCPs who originally sued Hoechst include: CMI Industries, Inc., Coats American, Inc., Hampton Capital Partners, LLC (d/b/a Gulistan Carpet), Mt. Vernon Mills, Inc., and Avondale Mills.

In Spring 2004, NCP Avondale Mills amended its complaint for the second time in order to broaden its cause of action and name additional Defendants, including Celanese AG. Specifically, Avondale's Second Amended Complaint expressly alleges that the price-fixing, customer allocation, and bid ridding conspiracy began as early as 1995. (Avondale's Second Am. Compl. ¶2) Avondale also included a state law cause of action based upon its indirect purchases of PSF (*i.e.*, purchases of PSF from third parties for use in its yarn products). (Avondale's Second Am. Compl. ¶8)

In the Fall of 2006, two (2) new civil actions were commenced by different Non-Class Plaintiff groups - the Burlington Plaintiffs and the Parkdale Plaintiffs.[4] Both of the new actions name the Hoechst Celanese entities as Defendants and allege facts similar to those included within the five (5) original NCP complaints that remain.

Only Avondale Mills and the Burlington Plaintiffs name Celanese AG as a defendant.[5] (Avondale's Second Am. Compl. ¶25; Burlington Compl. ¶26) The Burlington Plaintiffs also name Grover Smith ("Smith"), former Vice-President and General Manager of Hoechst Celanese's North

---

[4] These civil actions introduced twenty-five (25) new Plaintiffs to the litigation as discovery was supposed to be coming to a close. The **"Burlington Plaintiffs"** (13) now suing Hoechst and Grover Smith in **3:06CV387** include: Burlington Industries, LLC, Carolina Mills, Inc., Frontier Spinning Mills, Inc., Galey & Lord Industries, LLC, Greenwood Mills, Inc., Henderson-Harriet Welfare Association, Inc., Inman Mills, Johnston Industries, Inc., Malloy & Company (f/k/a Cheraw Yarn Mills, Inc.), Mayfair Mills, Inc., National Spinning, Co., Inc., Pharr Yarns, LLC, and Swift Textiles, LLC. The **"Parkdale Plaintiffs"** (12) suing Hoechst in **3:06CV390** include: Parkdale Mills, Inc., Parkdale America, LLC, Springs Industries, Springs Global US, Inc., Fruit Of The Loom, Inc., Union Underwear Company, Inc., Martin Mills, Inc., Leesburg Yarn Mills, Inc., Fayette Cotton Mill, Inc., Rabun Apparel, Inc., Russell Corporation, Shaw Industries Group, Inc.

[5] There is nothing in the record indicating that Avondale ever effected service on Celanese AG in the manner required under the Hague, which explains in part why Celanese AG has not moved to dismiss Avondale's Second Amended Complaint based on lack of personal jurisdiction. It appears the same is true with respect to NCP Coats American, Inc., and Hoechst AG.

American PSF business, as a Defendant.[6]  (Burlington Compl. ¶27)

The Burlington and Parkdale Plaintiffs allege that the Hoechst Celanese entities  continued to engage in the manufacture of polyester staple fiber at its Canadian plant located in Millhaven, within the province of Ontario ("Millhaven") after the sale of its polyester staple fiber assets to Arteva / KoSa.  (Burlington Industries' Am. Compl., ¶¶29, 30; Parkdale Mills' Compl., ¶37) Plaintiffs contend that the polyester staple fiber manufactured in Millhaven was marketed and sold by Arteva / KoSa in the United States at artificially inflated prices pursuant to the alleged price-fixing scheme.  Plaintiffs allege that the Hoechst Celanese Defendants continued to participate and benefit from the charged conspiracy beyond the sale of its business to Arteva / KoSa at least through December 1999, and possibly as late as 2001.   (Burlington Industries' Am. Compl., ¶¶29, 30, 49; Parkdale Mills' Compl., ¶2)

In addition to the federal antitrust claims, the Burlington Plaintiffs, Parkdale Plaintiffs, and Avondale  bring state law causes of action as indirect purchasers alleging violation of antitrust and consumer protection laws, N. C. Gen. Stat. 75-1, *et seq.*   In addition, the Parkdale Complaint alleges a cause of action on behalf of Springs Industries only under South Carolina's unfair and deceptive trade practices act, Article I of Title 39, Chapter 5 of the South Carolina Code, S.C. Code §39-5-20.

## II.  Evolution Of The Hoechst Celanese Defendant Group

The Hoechst Celanese corporate entities currently named by one or more NCP as Defendants are: **CNA Holdings, Inc.** (f/k/a Hoechst Celanese Corporation, and HNA Holdings, Inc.), **Celanese**

---

[6] Smith was Vice-President  and General Manager of Polyester Staple North America for Defendant Hoechst Celanese.  (Id.)  Smith was responsible for the marketing and sale of PSF in North Carolina and throughout the United States and supervised Tom Nixon and Troy Stanley, both sales managers for PSF.  (Id.)   Like the Hoechst Celanese Defendants, Smith has moved for summary judgment.

**Americas Corporation** (f/k/a Hoechst Corporation), **Hoechst Aktiengesellschaft or Hoechst AG** (now d/b/a as Hoechst GmbH), and **Celanese Aktiengesellschaft or Celanese AG.**[7]

CNA Holdings, Inc., f/k/a Hoechst Celanese Corporation ("Hoechst Celanese") is a Delaware corporation. During the relevant time period, its principal place of business was in New Jersey. (Avondale's Second Am. Compl. ¶22; Burlington Compl. ¶22; Parkdale Compl. ¶28)

Celanese Americas Corporation, f/k/a Hoechst Corporation ("Hoechst Corp."), is a Delaware corporation with its principal place of business in New Jersey. (Avondale's Second Am. Compl. ¶24; Burlington Compl. ¶24;Parkdale Compl. ¶29) "Hoechst Corp. is a holding company that has . . . been the sole shareholder of Hoechst Celanese since at least 1987." (Avondale's Second Am. Compl. ¶24)

Defendants Hoechst AG and Celanese AG are both foreign corporations incorporated under the laws of Germany. Hoechst AG's principal place of business is Frankfurt am Main, Germany. (Kuehlhorn Decl. ¶4)[8] Celanese AG's principal place of business is in Kronsberg, Germany. (Pohlmann Decl. ¶6)[9]

Prior to 1999, Hoechst AG was the parent entity to Hoechst Celanese Corporation and Hoechst Corporation. During a reorganization within Hoechst AG, Celanese AG became the parent to these corporate defendant entities.

---

[7] For purposes of the instant order, the Court will refer to the subsidiary corporate defendants by their original names - Hoechst Celanese Corporation and Hoechst Corporation.

[8] **Dr. Thomas Kuehlhorn** ("Kuehlhorn") is "the German equivalent of an in-house counsel at Hoechst." (3:03CV296 / Hoechst's Mem. In Supp. at 5, n. 4.)

[9] **Andreas Pohlmann** ("Pohlmann"), private consultant to Celanese AG and former Executive Vice President and Chief Administrative Officer of Celanese Corp, and Chairman of the Board of Management of Celanese AG. (Pohlmann Decl. ¶3)

Defendants Hoechst AG and Celanese AG seek dismissal pursuant to FED. R. CIV. P. 12(b)(2). Both foreign entities contend that each maintained a separate and distinct corporate existence from their subsidiaries and with respect to each other, and argue that due process principles preclude the Court from exercising *in personam* jurisdiction.[10]

## A. Hoechst AG Indirectly Owned Hoechst Celanese Corporation / Hoechst Celanese Corporation Manufactured PSF In The United States From Before 1995 Through 1998

In 1987, Hoechst AG acquired Celanese Corporation and formed Hoechst Celanese Corporation in the United States. (Tollison Decl. ¶19; Avondale's Second Am. Compl. ¶23a) Hoechst Celanese Corporation sold PSF from facilities in Charlotte, North Carolina, and Salisbury, North Carolina, from before 1995 through 1998. (Tollison Decl. ¶21; Avondale's Second Am. Compl. ¶22b)

### 1. "Trevira" Encompasses Hoechst AG's Worldwide PSF Business

In or around 1994, Hoechst AG consolidated all of its worldwide fiber businesses (acetate and polyester). (Kuehlhorn 2/5/07 Decl. ¶5) Hoechst AG's worldwide fiber businesses were organized under a non-corporate umbrella named "Trevira." (Id.; Harris 12/21/06 Dep. at 71.) According to Hoechst AG, Trevira was "a management division of the Hoechst group, organized by business lines as opposed to geographic regions."[11] (Kuehlhorn Reply Decl. ¶7) Jurgen Dorman, Hoechst AG's CEO at the time, "proposed that Hoechst no longer be run as a regional fiefdom, but

---

[10] The Hoechst Celanese Defendant subsidiaries located in the United States, Defendants CNA Holdings, Inc. and Celanese Americas Corporation, do <u>not</u> contest jurisdiction.

[11] The "Hoechst Group" is defined as "the group of companies comprised of the direct and indirect affiliates of Hoechst AG worldwide." (Kuehlhorn Reply Decl. ¶7) The Hoechst Group was comprised of over 400 entities operating in over 100 countries.

instead have worldwide product mandates." (Harris Dep. at 66.)[12]   Trevira was the name of a well-known trademark for polyester fibers. (Kuehlhorn Reply Decl. ¶7)   Thus, the Trevira name was officially adopted (possibly as late as June 1996) by Hoechst AG in the hopes of providing a common identifiable name in the industry and to customers.[13]   (Id.; 6/96 Fibers Leadership Committee Minutes, ¶10d)

### 2. Relationship Forged Between Trevira And Celanese Canada

Celanese Canada, Inc. ("CelCan") was Hoechst AG's Canadian subsidiary in the polyester business.[14]   In addition to manufacturing PSF, CelCan also manufactured polyester resins / PET (polyethylene terephthalate) packaging resins.

As early as January 1, 1990, CelCan entered into an agreement with Hoechst Celanese and Hoechst Celanese Chemical Group, Inc.,[15] which addressed the intellectual property rights required to produce the polyester staple and resin products being manufactured by CelCan.[16]   (NCPs' Exh.

---

[12] **William Bruce Harris** ("Harris"), former Hoechst AG / Trevira / Hoechst Celanese Corporation executive.  *(See* Section "IV, A, 1,a, i.")

[13] It is not clear exactly when the division began to refer to itself publicly as Trevira.  Harris testified that the worldwide fibers business became known as Trevira at some point after 1994.  (Harris Dep. at 15.)  June 1996 committee meeting minutes indicate that the Trevira name may not have been used externally until 1996.  (6/96 Minutes, ¶10d) (minutes reflect a decision that "the name of the global fibers business will be TREVIRA.")

[14] CelCan is not a Defendant and has never been a party to this litigation.  According to Defendants, prior to December 21, 1999, "Celanese Canada was a separate and independently operated, publicly-registered company, whose shares were traded on the Montreal and Toronto Stock Exchanges." (Broussard Decl. ¶9 / Celanese Canada 1998 Annual Report)

[15]  It is not clear where Hoechst Celanese Chemical Group, Inc., fits within Hoechst AG's corporate structure, or whether it is another name for Hoechst AG, the Hoechst Group, or Hoechst Celanese.

[16] The January 1, 1990 agreement provided for the quarterly payment by CelCan to Hoechst Celanese of one percent (1%) of its net sales as royalties for such rights.

At some point prior to April 17, 1998, Trevira integrated CelCan's Millhaven Plant into its fold and CelCan became part of Trevira's worldwide fibers division. (Harris 12/21/06 Dep. at 68.) The April 17, 1998 date is an outside (latest) date. In 1997, CelCan referred to its product lines as falling "within two of the Hoechst Group's global businesses: Basic Chemicals and Fibres (Trevira)." (NCPs' Exh. 37A) In addition, press releases issued in April and May 1998 referred to CelCan's relationship with Trevira as "long-standing." (Id. / Weiner Dep. at 65.) Harris summarized the essentials of the business relationship in correspondence dated April 28, 1998.[17] (NCPs' Exh. 76) In its May 5, 1998 response, CelCan confirmed Harris's description of the "present business relationship" between Hoechst Celanese,[18] Trevira and CelCan. (NCPs' Exh. 76)

Pursuant to the Sales and Marketing Agreement ("Marketing Agreement") entered into between CelCan and Hoechst Celanese / Trevira, Trevira obtained the exclusive right to market and sell all Millhaven product, excluding product sold within Canada. (Schedule A, ¶IV,A and ¶XII,A) With respect to these sales (United States and worldwide sales excluding Canada), CelCan agreed to pay Trevira, on a quarterly basis, 2% of the invoiced net sales proceeds for products shipped during the quarter. (Id., ¶X,A; Pitts Dep. at 69-71.) The same arrangement applied in the converse. (Pitts Dep. at 56.) Trevira agreed to pay CelCan the same amount quarterly for all Trevira product shipped into Canada. (Id., ¶XB; Pitts Dep. at 71.) Thus, CelCan retained 98% of its net sales proceeds for all United States PSF sales and Trevira retained 98% of its net sales proceeds for all

---

[17] The terms of the parties' agreement are outlined in a document described as "Schedule A" and attached to the April 28, 1998 letter or "Letter Agreement." (Id.)

[18] On January 2, 1998, Hoechst Celanese formally changed its name to HNA Holdings, Inc. (Burlington's Am. Consol. Compl. ¶23)

Canadian PSF sales.

HNA and CelCan further agreed that in the event of a change of control (*i.e.*, Trevira is divested by Hoechst AG), their relationship would continue indefinitely until receiving the required written notice from the other party. (Id., ¶XII, A) The parties also contemplated that the Marketing Agreement would be assignable to the entity ultimately controlling Trevira.[19] (2/28/98 Harris Letter at 2-3.)

The Marketing Agreement also designated Hoechst Celanese / Trevira as CelCan's primary supplier of raw materials. (Schedule A, ¶III,A)

### 3. Hoechst AG / Hoechst Celanese Corporation Sells Its PSF Assets Within The United States To Arteva / KoSa And Trevira's Marketing Agreement With Celanese Canada Is Assigned To Arteva / KoSa

In 1998, Hoechst AG began efforts to sell off its PSF business. On December 10, 1998, Hoechst AG / Hoechst Celanese sold its PSF assets located in the United States (and Mexico) to Arteva / KoSa.[20] (Tollison Decl. ¶24; Vellturo Decl. ¶4) The terms of the parties' U.S. agreement may be found within a document dated October 12, 1998, and titled, "Asset Purchase Agreement" (or "APA"). The APA states that the sale of Hoechst AG's United States and Mexico PSF businesses to Arteva / KoSa occurred in conjunction with the sale of certain other PSF businesses worldwide to various third parties. (APA at 1.)

---

[19] Because the agreement was later assigned, it remained in effect through the date of CelCan's sale of the Millhaven facility to Arteva / KoSa. (Broussard Decl. ¶¶8,9)

[20] For convenience, the Court refers to Arteva / KoSa as the purchaser although the actual entities involved at that time were Koch Industries, Inc. ("Koch") and IMASAB S.A. de C.V. ("IMASAB"). Koch and IMASAB entered into a joint venture and purchased Hoechst's AG's PSF assets. (Avondale's Second Am. Compl. ¶¶21b and c; Burlington Compl. ¶29) Koch eventually bought out IMASAB. (Id.)

In the Asset Purchase Agreement, the parties expressly contemplated that CelCan would ultimately sell its Millhaven facility to Arteva / KoSa. In addition to mention within Arteva / KoSa's letter of intent dated April 22, 1998, the APA itself provided a mechanism whereby Hoechst AG / Hoechst Celanese could require Arteva / KoSa to effect the purchase subject to certain conditions being met. (APA, Art.XI §11 7(b) / NCPs' Exh. 78 at 3-4.)

Hoechst Celanese / Trevira also simultaneously assigned its Sales and Marketing Agreement with CelCan to Arteva / KoSa. (NCPs' Exh. 77 / Pitts Dep. at 122.) Effective December 10, 1998, KoSa, as an assignee, became responsible for the sales and marketing of all PSF product sold from the Millhaven, Ontario facility to U.S. - based customers. (Broussard Decl. ¶9 / Marketing Agreement)[21]

Accordingly, as of December 1998, Hoechst Celanese was no longer producing PSF within the United States. Even so, the rights to the "Trevira" name and trademark were retained by Hoechst AG. (APA, Art. II, ¶2.2(j)) CelCan continued to produce PSF for distribution within the United States and North Carolina.

## B. Celanese AG Is Created / Celanese AG Becomes The Parent Entity To Hoechst AG's Former PSF Businesses

On October 22, 1999, a wholly-owned Hoechst AG subsidiary, Diogenes Erste Verrndgensverwaltungs AG ("Diogenes"), was renamed "Celanese AG," and a new legal entity created. (Pohlmann Decl. ¶5) Defendants describe the separation of the Hoechst AG and Celanese AG legal entities as a "demerger" (*i.e.*, Celanese AG was "demerged" from Hoechst AG.) (Broussard Dep. at 229; Pohlmann Decl. ¶5) The purpose of the demerger was for Hoechst AG to

---

[21] **Peter Broussard** ("Broussard"), former Associate General Counsel at Hoechst Celanese Corporation ("Hoechst Celanese"), from 1993 through August 1, 2006.

transfer all of its industrial chemical-related assets *(PSF included)* to Celanese AG.[22] (Pohlmann Decl. ¶5; Broussard Decl. ¶8)

When Celanese AG separated from Hoechst AG, so did its subsidiaries. Diogenes had been the indirect 100% shareholder of Hoechst Corp., which was the 100% shareholder of Hoechst Celanese.[23] (Pohlmann Decl. ¶5) Consequently, Hoechst Celanese and Hoechst Corp. were also demerged from Hoechst AG. (Broussard Dep. at 250-51.) "Celanese AG has been the direct or indirect 100% shareholder of Hoechst Corp., and the ultimate parent of Hoechst Celanese, since at least 1999." (Avondale's Second Am. Compl. ¶25)

Celanese Canada, which was still engaged in PSF production, also became a wholly owned subsidiary of Celanese AG. Prior to the demerger, Hoechst AG was the majority shareholder (56% owned indirectly) of CelCan and the remaining 44% of the outstanding shares of CelCan were publicly held by unaffiliated shareholders. (NCPs' Exh. 78) In June 1999, Hoechst AG's shares were transferred to HNA Acquisitions, Inc., an indirect wholly-owned subsidiary of Hoechst AG formed for purposes of accomplishing the reorganization described herein.[24] (Broussard Decl. ¶8)

---

[22] A similar reorganization occurred within Hoechst AG's life science business in December 1999 when Hoechst AG merged with Rhone-Poulenc S.A.. (Avondale's Second Am. Compl. ¶23d; Burlington's Am Consol. Compl. ¶25) "Aventis S.A., a French corporation, is the product of the December 1999 merger of the life science business of Hoechst AG and Rhone-Poulenc S.A." (Avondale's Second Am. Compl. ¶23d) "Hoechst AG is now an intermediate holding company that operates as an affiliate of Aventis under the Aventis logo." (Avondale's Second Am. Compl. ¶23c; Burlington's Am. Compl. ¶25) On October 18, 2005, Hoechst AG became Hoechst GmbH. (Kuehlhorn 11-20-06 Decl. ¶2)

[23] In August 1999, in conjunction with the transfer of the ownership of Hoechst Corp. and Hoechst Celanese to Celanese AG, HNA Holdings, Inc. (f/k/a Hoechst Celanese), formally changed its name *again* to CNA Holdings, Inc. (Burlington's Am. Consol. Compl. ¶23)

[24] It is unclear from the record exactly where HNA Acquisitions, Inc., fits within the corporate structure.

By the date of the demerger, HNA Acquisitions, Inc., controlled nearly 100% of Celanese Canada's outstanding shares. (Broussard Decl. ¶8) HNA Acquisitions' shares in Celanese Canada were then transferred to Celanese AG. (Broussard Decl. ¶8) As a result of the demerger, and the acquisition of the publicly owned interests by Celanese AG, Celanese Canada became an indirect wholly-owned subsidiary of Celanese AG. (Am. Pohlmann Decl. ¶¶7, 8)

### 1. Celanese Canada Sells The Millhaven Facility To Arteva / KoSa And Ceases To Manufacture PSF

As early as 1998, CelCan and Arteva / KoSa entered into negotiations for the sale of the Millhaven, Ontario facility. The reason for the delay of CelCan's purchase is not clear. A document submitted to Canadian authorities by a Canadian affiliate of KoSa in connection with the Millhaven sale represents that the sale was not possible in 1998 because Hoechst AG was not the *sole* shareholder of CelCan at the time. Defendants contend that CelCan purposefully declined to approve the sale of Millhaven to Arteva / KoSa contemporaneously with Hoechst Celanese's sale of its PSF business because CelCan wanted an opportunity to assess whether other options might better advance the interests of its shareholders.[25] (Pitts Dep. at 58.)

In December 1999, CelCan sold its Millhaven, Ontario PSF plant to Arteva / KoSa. Arteva / KoSa's purchase of CelCan was described by KoSa as "step two of a larger transaction otherwise completed on December 10, 1998 . . ." – referencing Hoechst AG's sale of its U.S. and Mexico PSF assets to Arteva / KoSa. (NCPs' Exh. 78)

---

[25] According to Defendants, CelCan and its President sought professional advice prior to agreeing to the sale. CelCan employed an independent committee of its Board of Directors to evaluate the possibilities, who in turn retained investment bankers to identify possible strategic business alternatives. (Defs.' Mem. In Supp. S. J. at 97.) The President of CelCan also retained a consulting company. (Pitts Dep. at 59-63, 152-54.)

In November 1999, immediately prior to the sale of the Millhaven facility, CelCan decided to stop PSF production at Millhaven. (NCPs Exh. 78)  Thus, Arteva / KoSa acquired the staple manufacturing assets (but no ongoing PSF business) in addition to the polyester resin business as an operating business.  (Id.)  Arteva / KoSa agreed to complete the shutdown process, which was not expected to end before March 2000.  (Id.)

### 2. Celanese AG Assumes Liabilities Of Former Hoechst AG Entities Involved In Demerger[26]

Celanese AG assumed Hoechst AG's liabilities with regard to its PSF business.  Broussard testified at deposition about the identity of the entities with responsibility for any "contingent or potential liability as a result of the price fixing and customer allocation claims relating to PSF against CNA Holdings and Celanese Americas Corporation in this case."  (Broussard Dep. at 228.)  Broussard explained that "Celanese AG has the liability associated for any claims under [the] polyester staple business for Hoechst AG. . . Celanese AG has indemnified Hoechst AG for that liability as part of the merger." (Broussard Dep. at 228-30; *See also* SDNY Action:  Arteva / KoSa's Compl. ¶16 / *quoting* Celanese AG's Securities Exchange Commission Form 20-F dated March 7, 2002) (Celanese AG "assumed all of the assets and liabilities (including contractual rights and obligations related to other current and former Hoechst businesses) of the . . . businesses [demerged from Hoechst AG into Celanese AG].")

---

[26] While Celanese's agreement to indemnify Hoechst AG provides some evidence that Celanese AG recognized the potential for future litigation relating to the PSF business,  this fact is not relevant to the question of jurisdiction because it does not amount to an agreement by Celanese AG to defend Hoechst AG in future United States litigation.  Indemnification between these foreign Defendants can be accomplished outside of the instant litigation.

# III.  Standard Of Review And Burden Of Proof

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence."   Carefirst Of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir.2003)(*citing*  Mylan Laboratories, Inc. v. Akzo, N.V., 2 F.3d 56, 59-60 (4th Cir.1993)).   However, when the Court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff is only required to establish a *prima facie* case for the exercise of personal jurisdiction.  Id. (*citing* Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989)(emphasizing standard of review when personal jurisdiction inquiry is limited to the allegations within the complaint, motions, and legal memoranda)).   In determining whether a plaintiff has made the requisite showing, the Court must construe all relevant facts in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.   Combs, 886 F.2d at 676; Carefirst, 334 F.3d at 396 (*citing* Mylan Labs., 2 F.3d at 60).

Ordinarily, a plaintiff's factual allegations concerning personal jurisdiction are sufficient to establish a *prima facie* showing.  Barclays Leasing, Inc. v. Nat'l Bus. Syss., Inc., 750 F.Supp. 184, 186 (W.D.N.C. 1990) (*citing* Dowless v. Warren-Rupp Houdailles, Inc., 800 F.2d 1305, 1307 (4th Cir.1986)).   Mere allegations may be sufficient because, absent the presentation of evidence controverting Plaintiff's allegations, the factual allegations of the complaint (as opposed to conclusory allegations) must be taken as true.  Id. (*citing* Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir.1985)).   Once the party opposing the exercise of jurisdiction presents evidence indicating that the requisite minimum contacts do not exist, the party bearing the burden

to establish personal jurisdiction must come forward with affidavits or other evidence in support of its position. *See* Anderson v. Dobson, 2006 WL 1431667, *4 (W.D.N.C.) (*citing* Clark v. Remark, 993 F.2d 228 (4th Cir.1993) (*unpublished*); Barclays Leasing, 750 F.Supp. at 186.) Where both sides present evidence regarding personal jurisdiction, factual conflicts must be resolved in favor of the party asserting jurisdiction for the limited purpose of determining whether a *prima facie* showing has been made. Id.; Barclays Leasing, 750 F.Supp. at 186 (*citing* Combs, 886 F.2d at 676.)

The District of Columbia Court explained recently that a *prima facie* showing in this context means that "plaintiff must present evidence sufficient to defeat a motion for judgment as a matter of law." Reese Bros., Inc. v. U.S. Postal Service, 477 F.Supp.2d 31, 36 (D.D.C. 2007) *(internal citations omitted)*. In doing so, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." Reese Bros., 477 F.Supp. 2d at 36-37 (*quoting* Arista Records, Inc. v. Sakfield Holding Co. S.L., 314 F.Supp.2d 27, 30 (D.D.C. 2004)); *See also* Revell v. Lidov, 317 F.3d 467, 469 (5th Cir.2002) ("The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.")

## IV. Personal Jurisdiction Analysis / FED. R. CIV.P. 12(b)(2)

"[B]efore a federal court can exercise personal jurisdiction over a defendant in a federal question case, the court must determine whether an applicable statute potentially confers jurisdiction by authorizing service of process on the defendant, and whether the exercise of jurisdiction would satisfy the requirements of due process." Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1349 (Fed. Cir.2002)(patent case); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 626-27 (4th Cir.1997)(applying RICO's nationwide service of process

statute).

This Court engaged in a similar analysis during an earlier phase of these consolidated pretrial proceedings. In denying Nan Ya Taiwan's motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, the undersigned construed Section 12 of the Clayton Act as authorizing worldwide service of process and thereby providing another mechanism for obtaining *in personam* jurisdiction over a foreign entity charged with violating the federal antitrust laws.[27] *(See* Document #205 - September 23, 2004 at 5-10.) Although the facts alleged and presented with respect to Defendants Hoechst AG and Celanese AG are different, the general framework for analysis is the same. The Court will first identify the statutory basis for exercising personal jurisdiction, engage in a Section 12 venue analysis, and then consider Defendants' due process arguments. The Court will also discuss Plaintiffs' argument that Celanese AG waived its ability to challenge lack of personal jurisdiction.

---

[27] In the case of Nan Ya Taiwan ("NYT"), the undersigned relied in part upon Plaintiffs' allegations that NYT exercised a certain amount of control over its wholly owned subsidiary, Nan Ya America ("NYA"). The Court applied a "national contacts" test and found that general jurisdiction could be found in two ways: NYT's systematic and continuous export business (exporting products to the United States) and imputing to NYT the actions of NYA, which was producing PSF in the United States. The Court further found that specific jurisdiction existed due to allegations that NYT directed the anticompetitive activities of Nan Ya America. As a result, the Court determined that the exercise of personal jurisdiction over NYT was consistent with due process.

The Court did not rely upon a "conspiratorial theory" in order to establish venue and / or personal jurisdiction (i.e., the notion that venue as to Defendant NYT, if proven to be a co-conspirator, could lie where venue existed as to any other co-conspirator) and similarly declines to do so here. *See* Charles Alan Wright, *et al.*, 14D FED. PRAC. & PROC. JURIS. 3d §3818 (2007) (describing the "death knell" of the conspiratorial theory).

## A. Section 12 Of The Clayton Act Potentially Provides A Statutory Basis For Exercising Personal Jurisdiction Over Hoechst AG and Celanese AG[28]

Section 12 of the Clayton Act potentially provides a statutory basis for exercising personal jurisdiction over both foreign Defendants. Section 12 provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.[29] As a result, Section 12 of the Clayton Act has been described as "a combination venue and nationwide service of process statute." *See* Eastman Outdoors, Inc. v. Archery Trade Ass'n, 2006 WL 1662641, *4 (E.D.Mich.2006).

This Court previously held that the venue provision within Section 12 must be satisfied before worldwide service of process is authorized. *See* GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343 (D.C.Cir.2000)(plain language requires holding that Section 12's venue and worldwide service of process provisions are interdependent); Daniel v. Am. Bd. Of Emergency Med., 428 F.3d 408, 423-424 (2nd Cir. 2005); Mgmt. Insights, Inc. v. CIC Enters., Inc., 194 F.Supp.2d 520, 531 (N.D.TX.2001); Ballard v. Blue Shield of S. W.Va., Inc., 543 F.2d 1075, 1979-80 (4th Cir.1976) (stating in dictum that the venue provisions within the Clayton Act were not exclusive); *But see* Isostatic Graphite Antitrust Litig., 2002 WL 31421920 (E.D. Pa. Sept.19, 2002) (distinguishing GTE New Media Servs. and finding it unlikely that Congress intended the Section 12 Clayton Act venue analysis *more difficult* to satisfy than the alien venue statute which allows an

---

[28] Incredibly, in their motion to dismiss, Defendants failed to mention the Clayton Act's worldwide service of process provision as a means of establishing personal jurisdiction.

[29] The antitrust laws, referred to in the above text, are defined in Section 12 of this title.

alien to be sued in any district, 28 U.S.C. §1391(d)).

Both Hoechst AG and Celanese AG have been formally served by one or more of the NCPs.[30] Thus, if venue is proper under Section 12, service of process is a sufficient grounds for exercising *in personam* jurisdiction over Hoechst AG and Celanese AG as long as so finding is consistent with due process.

## 1. Exercise Of Personal Jurisdiction Over Hoechst AG

### a. Venue Is Proper Under Section 12 Because Hoechst AG "Transacted Business" In The State Of North Carolina

For purposes of Section 12 of the Clayton Act, "[t]he test of venue has been described by the Supreme Court as the practical, everyday business or commercial concept of doing or carrying on business "of any substantial character."" Chrysler Corp. v. Gen. Motors Corp., 589 F.Supp. 1182, 1195 (D.D.C. 1984) (*quoting* United States v. Scophony Corp., 333 U.S. 795, 807 (1948)). "The determination of whether a defendant has transacted business is largely a factual question, based on "tangible manifestations of doing business."" United States v. Smithfield Foods, Inc., 332 F.Supp.2d 55, 61 (D.D.C.2004) (*quoting* Caribe Trailer, Sys., Inc. v. Puerto Rico Maritime Shipping Auth., 475 F.Supp. 711, 716 (D.D.C. 1979)). The Court determines whether a defendant "transacted business" in the forum at the time the cause of action arose. Smithfield Foods, 332 F.Supp.2d at 61 (*citing* Lee v. PlyGem Indus., Inc., 593 F.2d 1266, 1273 (D.C. Cir.1979) ("We thus conclude that at least in situations where the business activities relied on to establish Section 12 venue are bound up in the

---

[30] Hoechst AG was initially served by Avondale in 2004. (*See* 3:03CV296 / Document #24) Hoechst AG, through counsel, acknowledged service of Avondale's Second Amended Complaint on October 24, 2006. (*See* 3:03CV1516 / Document #477; 3:03CV296 / Documents #52, #53)) Hoechst AG was served by the Parkdale Plaintiffs on November 2, 2006. (*See* 3:06CV390 / Document #37) Hoechst AG and Celanese AG were served by the Burlington Plaintiffs in March 2007. (*See* Document #578)

course of conduct alleged to transgress the antitrust laws, the temporal frame of reference of that section is the point at which the cause of action arises, not the date suit is commenced."); Eastland Constr. Co. v. Keasbey & Mattison Co., 358 F.2d 777, 780 (9th Cir.1966)).

It is well established that a corporation transacts business either directly or indirectly through its agents or subsidiaries. *See, e.g.*, Eastman Kodak Co. v. S. Photo Materials, Co., 273 U.S. 359, 373 (1927); Scophony Corp., 333 U.S. at 810. In order for a foreign parent corporation to be amenable to suit in the United States based on the activities of its subsidiary within the United States, it must exercise a control relationship over its subsidiary. Chrysler Corp., 589 F.Supp. at 1200 (*citing* Tiger Trash v. Browning Ferris Indus., Inc., 560 F.2d 818, 822 (7th Cir.1977)). Despite a formal separation, where the parent exercises continuing supervision and intervention in the subsidiaries' affairs, the subsidiaries' activities are attributable to the parent for Clayton Act venue purposes. Id. (*citing* Scophony Corp., 333 U.S. at 814.) However, it is not necessary to demonstrate that day-to-day control over the subsidiary existed in order to find that venue is proper.[31] Chrysler Corp., 589 F.Supp. at 1202 (federal trial courts have abandoned the day-to-day control test in favor of the more practical business concept approach); Campos v. Ticketmaster Corp., 140 F.3d 1166, 1173 (8th Cir.1998). Further, this practical standard is not altered because the defendant is a company incorporated outside of the United States. Id. at 1195 (*quoting* Scophony, 333 U.S. at 810).

---

[31] For purposes of venue, a showing of day-to-day control by the parent entity is not required and a traditional veil-piercing analysis is not warranted. *See e.g.* 1 C. Keating & G. O'Gradney, FLETCHER CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS §43.70 (2007) ("[P]iercing the corporate veil for the purpose of acquiring jurisdiction over a subsidiary corporation does not require the same strict standards as are necessary to hold a parent corporation liable in damages for acts of its subsidiary."); *See also* Stuart v. Spademan, 772 F.2d 1185, 1198 n.12 (5th Cir.1985) ("It should be noted that the alter ego test for attribution of contacts, *i.e.*, personal jurisdiction, is less stringent than that for liability.")(*citing* Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2nd Cir.1981)).

The Court undertakes a totality of the circumstances analysis in considering whether the requisite degree of corporate control is present. <u>Scophony Corp.</u>, 333 U.S. at 816-817; <u>MCI Comm'ns Corp. v. AT & T</u>, 1983 WL 1881, at *7-8 (D.D.C. Oct. 4, 1983) (court looks to the totality of the relationship between the parent and its subsidiaries).

Hoechst AG contends that Plaintiffs cannot demonstrate that Hoechst AG's relationship with Hoechst Celanese and Hoechst Corp. was anything more than "routine and appropriate oversight by a parent company over its subsidiaries." (Hoechst AG's Reply at 4.) NCPs allege that Hoechst AG was either *directly or indirectly* involved in the management of its PSF business.[32] Viewed in the light most favorable to Plaintiffs, Hoechst AG "transacted business" within the district for purposes of the Clayton Act's venue provision.

William Harris was designated by Hoechst Celanese as its Rule 30(b)(6) representative to be deposed on December 21, 2006, by NCPs.[33] Despite Defendant's designation of Harris as the

---

[32] In **Avondale's** Second Amended Complaint, it alleges that "Hoechst AG manufactured and sold PSF through its subsidiary, Defendant Hoechst Celanese, from facilities in Charlotte, North Carolina, and Salisbury, North Carolina from before 1995 and through 1998." (Avondale's Second Am. Compl. ¶23b) The **Burlington Plaintiffs** allege: "Hoechst AG was, until 1999, **directly involved** in the management of Hoechst Corp. and Hoechst Celanese in the manufacture and marketing of PSF. During the conspiracy period, Hoechst AG so dominated and controlled Hoechst Corp. and Hoechst Celanese operations that Hoechst Corp. and Hoechst Celanese were mere instrumentalities or alter egos of Hoechst AG. Hoechst AG's complete control of Hoechst Corp. and Hoechst Celanese rendered Hoechst Corp. and Hoechst Celanese mere conduits for Hoechst AG and established an intercorporate agency relationship between them. Any corporate veil between Hoechst Corp., Hoechst Celanese and Hoechst AG must be pierced to prevent fundamental unfairness or inequity." (Burlington's Am. Consol. Compl. ¶25) The **Parkdale Plaintiffs** allege essentially the same facts in support of its jurisdiction argument. (Parkdale's Consol. Compl. ¶32 )

[33] Harris appeared as the Rule 30(b)(6) corporate representative for Hoechst Celanese and / or the entire Hoechst Celanese Defendant group. It was the parties' practice to use the Hoechst Celanese, Hoechst, and Celanese names interchangeably to refer to one or more of the Hoechst Celanese Defendants. For example, the deposition transcript reflects that Mr. Torres appeared on behalf of the "Celanese Defendants and Grover Smith." (12-21-06 Harris Dep. at 2.)

corporate representative, there is a factual dispute regarding who Harris's actual employer was and the extent to which Harris' testimony may be considered by the Court. In his deposition testimony, Harris testified that he was the President and Chief Executive Officer of the worldwide fibers business **for Hoechst AG** from 1994 through December 1998. (Harris Dep. at 13.) He specifically testified that he was talking about "the German company Hoechst AG" and that he reported directly to Gunter Metz ("Metz"), Vice Chairman of Hoechst AG's Board of Directors, and Utus Mische ("Mische"), another member of Hoechst AG's Board of Directors. (Id. at 13, 27.)

Defendants suggest that Harris was never employed by Hoechst AG at all and was employed at all relevant times by either Hoechst Celanese or Trevira. (Kuehlhorn 2/5/07 Decl. ¶9; Kuehlhorn Reply Decl. ¶¶4, 8 ("employee of HCC and worked on behalf of Trevira"); Fox Decl. ¶¶2, 3) Hoechst AG submits the declaration of Joseph Fox, Esquire, Vice President of Human Resources and Employment Law of Celanese International Corporation ("Celanese") in support of this fact. (Defs.' Reply Exh. 6) Fox's declaration incorporates two documents he asserts are business records of Hoechst Celanese (printout date of 5/1/95) and Celanese (printout date of 1/22/07). According to Fox, Harris became Senior V.P. of the Textile Fibers Group **of Hoechst Celanese** on May 2, 1994 and held the position through December 7, 1998. (Fox Decl. ¶3 / Exh. B) The same records Defendants rely upon describe Harris's business unit as **"TEXT FIBERS GRP"** for the years 1994 - 1997. (Id. Exhs. A, B) Two different entries for previous years expressly indicate Harris's business unit was **"HOECHST CEL CORP."** (Id.) The business unit is not described as such for the time period relevant to the Court's inquiry.[34] For this reason, the Court does not find the documentary

---

[34] Exhibit B has a 12-7-98 entry under business unit as "CORPORATE 02." Prior to 1994, Harris's business unit is identified as either "HOECHST CEL CORP," "MISC," CEL INTERN'L CO.," CEL FIBERS OPRS.," "HOECHST CEL CORP" [again], or "CORPORATE 02."

evidence presented thus far determinative of Harris's true employment status.[35]  Indeed, if one is

tempted to suppose that Harris was never actually employed by Hoechst AG, then his apparent

confusion about his own employment status is telling in and of itself.[36]

Harris's testimony is significant because Harris makes clear that Hoechst AG / Trevira

transacted business within North Carolina.  Harris testified that although he did not have a primary

office location, he conducted his business on behalf of Hoechst AG / Trevira from New York, New

Jersey, and North Carolina.[37]  (Harris Dep. at 14.)   In fact, Harris traveled to Charlotte, North

Carolina, on a monthly basis.  (Harris Dep. at 39.)   While in North Carolina, Harris conducted sales

visits, participated in sales meetings, and entertained various PSF customers located and doing

business within the state.  (12/21/06 Harris Dep. at 151, 262-63, 277-78, 282, 285, and 288.)

Harris further testified that Hoechst AG / Trevira maintained a research facility in Charlotte

and that Hoechst AG / Trevira produced DMT, a material used in the production of PSF,  at a plant

in Bloomberg, North Carolina.  (Harris Dep. at 39, 55.)  This testimony is likewise contested by

Hoechst AG.  Hoechst AG contends that the  North Carolina research and production facilities were

_____

[35]  The Court notes that within certain summary judgment materials, Harris's signature is
expressly designated  "For HNA Holdings, Inc.," which was previously Hoechst Celanese Corp.  (*See*
NCPs' Exh. 76)  Harris's signature is also found on multiple documents as a representative of Trevira.
In Hoechst Celanese's SEC 10-K for 1996, Harris is actually identified as an executive in both capacities,
"Senior Vice President and Director" for Hoechst Celanese, and "President of Trevira, the worldwide
fibers business of Hoechst AG."  (NCPs' Exh. 37A)

[36] As already noted, when considering whether a *prima facie* showing of personal jurisdiction has
been made, disputes regarding jurisdictional facts must be viewed in the light most favorable to the non-
moving party.  Anderson, 2006 WL 1431667, *4. Therefore, for purposes of the instant Memorandum
and Order, the Court will credit Harris's deposition testimony.

[37]  Harris testified that he worked in New Jersey but stated that his work there was "not in the
same capacity" as his business in New York and North Carolina.  (Harris Dep. at 14.)  Harris did not
explain what he meant by this or how his role was different in New Jersey.

actually owned by Hoechst Celanese. (Kuehlhorn Reply, ¶12)   Yet, Hoechst AG - not Hoechst

Celanese - is the entity designated in the APA as having sold its PSF assets to Arteva / KoSa.[38]

Even so, actual ownership of these facilities is immaterial because they were part of the PSF

operations and would have been controlled by Trevira.

Harris testified that members of Hoechst AG's Board of Directors traveled from Germany

to the United States at least twice a year (and occasionally North Carolina) to meet with Harris

regarding the management of Hoechst AG's fiber unit.  (Harris Dep. at 28.)   One such meeting

occurred during July 1996 in Shelby, North Carolina.   Harris also testified that between 1994 and

1998, he would have suggested and discussed with Grover Smith various initiatives aimed at

improving the financial performance of the North American polyester staple fiber business.  (Harris

Dep. at 48-50.)  Harris stated he could not recall any specific discussion about pricing, but explained

that pricing of polyester staple would have been a subject of discussion.  (Harris Dep. at 50.)

Significantly, Harris testified that his approval was required for Trevira's publicly- announced price

increases and related press releases issued in North America.  (Harris Dep. at 62-63.)

Hoechst AG argues that Harris's "testimony shows, at most, that Trevira (Hoechst AG's

worldwide polyester fibers businesses separate and distinct from Hoechst AG) may have conducted

some limited business in North Carolina." (Defs.' Reply at 7.)   Trevira's North Carolina business

was of a substantial character and, thus, is not accurately characterized as "limited."   In addition,

---

[38] In the APA, Hoechst AG is identified as the "Seller" and Arteva / KoSa as the "Buyer." (APA,
Art. I at 20, .)  The APA also refers to a "Seller Group," which includes Hoechst Celanese and Hoechst
Corp.  (APA, Art. I at 21.)  The APA explains that "certain remaining assets in the United States and
Europe used to conduct Seller's worldwide polyester business are owned indirectly by Seller through
wholly-owned subsidiaries of Seller . . . ."  (APA at 1-2.)  The Shelby and Charlotte facilities were not
sold by Hoechst AG, but instead were leased to Arteva / KoSa.  (APA, Art.II §2.2, ¶¶ (k) and (r))

the evidence calls into question Defendants' assertion that Hoechst AG and Trevira were separate and distinct.

According to Dr. Kuehlhorn, Hoechst AG and Trevira were at all times completely separate and distinct entities. (Id. ¶¶6, 11)  As explained by Dr. Kuehlhorn:

> "[T]he Hoechst group was comprised of the direct and indirect affiliates of Hoechst AG worldwide, and was separate and distinct from Hoechst AG.  The Trevira Board differed from the management of Hoechst AG, and was not subject to the day-to-day operating control of Hoechst AG.  Accordingly, the actions of the Trevira Board reflected the decisions of the management of the fibers businesses of the Hoechst group; they were not the actions of the management of Hoechst AG."

> ***

> "[P]laintiff's contention that Hoechst AG made specific decisions regarding the conduct of Hoechst Celanese's PSF business at the Trevira Board meetings is factually baseless and incorrect.  None of the actions taken or decisions made at the Trevira Board meetings constitutes actions taken or decisions made by Hoechst AG.  To the contrary, these actions and decisions are attributable to the management of the fibers businesses of the Hoechst group of companies (operating under the trade name Trevira) – not Hoechst AG."

(Kuehlhorn 2/5/07 Decl. ¶¶6, 7)  Dr. Kuehlhorn's description of Hoechst AG's corporate structure does not adequately explain the function or role of Trevira.  Defendants represent that Trevira was a management division within the "Hoechst Group," yet the Hoechst Group represents all subsidiaries of Hoechst AG.[39]  There is no evidence before the Court establishing the existence of a "Hoechst Group" separate and apart from Hoechst AG itself.  The same is true of Hoechst AG and Trevira.  Because the Court finds that Hoechst AG and Trevira operated as one, Trevira's jurisdictional contacts are properly imputed to Hoechst AG for purposes of venue.  (*See* "IV, 1, b,

---

[39] Trevira's press releases described Trevira as "the world's largest polyester producer" and explained that "Trevira is part of Hoechst, an international group of companies spearheading innovation in healthcare, agriculture and chemicals." (NCPs' Exhs.  1321, 1323)

iii")

In sum, Hoechst Celanese, Hoechst Corp., and Trevira transacted business in North Carolina as contemplated by Section 12 of the Clayton Act. There is sufficient evidence that Hoechst AG exerted the requisite degree of control over Trevira and its subsidiaries, Hoechst Celanese Corporation, and Hoechst Corporation, to satisfy the venue provision within Section 12.

### b. The Exercise of Personal Jurisdiction Over Hoechst AG Comports With The Fifth Amendment's Due Process Requirements

Due process requires that the defendant has purposefully established "minimum contacts" with the forum. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The touchstone of the "minimum contacts" analysis is that an out-of-state person have engaged in some activity purposefully directed toward the forum. Hanson v. Denckla, 357 U.S. 235, 253 (1958); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). In addition, the court's exercise of personal jurisdiction must comport with traditional notions of "fair play and substantial justice." World-Wide Volkswagen Corp. v. Woodson, 444 U. S. 286, 292 (1980).

A court's exercise of personal jurisdiction may be either specific or general. If the cause of action is unrelated to the Defendant's activities in the forum state, Plaintiff must prove that the contacts are "continuous and systematic" to support the exercise of general jurisdiction over the Defendant. Helicopteros Nacionales de Columbia S.A. v. Hall, 466 U.S. 408, 415-16 (1984). If the cause of action is related to or arises out of Defendant's actions within the state, the Plaintiff can seek to establish "specific jurisdiction." Id. at 414 n. 8.

Because nationwide service is proper under Section 12, the Court applies a "national contacts" test in considering the due process requirements. ESAB Group, Inc., 126 F.3d at 626-27

(Fifth Amendment analysis appropriate under RICO nationwide service of process statute); Schrader v. Trucking Employees of N.Jersey Welfare Fund, Inc., 232 F.Supp.2d 560, 572 (M.D.N.C.2002)(following ESAB, applying national contacts test in ERISA context); Boon Partners v. Advanced Fin. Concepts, Inc., 917 F.Supp. 392, 397 (E.D.N.C.1996)(national contacts theory applicable where federal statute authorizes nationwide service of process); Mgmt. Insights, 194 F.Supp.2d at 532; 4 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, Civ. §1068.1 (3d ed. 2004) (recognizing propriety of applying a national contacts test when defendant is served with process pursuant to a provision in a federal statute).

Here, Defendants contend that the exercise of personal jurisdiction against them would run afoul of the Due Process Clause of the Fourteenth Amendment. Defendants assert that the North Carolina long-arm statute, N.C. Gen. Stat. §1-75.4, does not provide a basis for personal jurisdiction and that Defendants lack "minimum contacts" with North Carolina as opposed to the United States.[40] Defendants' argument is premised upon the idea that Clayton Act venue cannot be established. Because the Court finds that Hoechst AG either directly or indirectly transacted business within North Carolina, the Court may employ a national contacts test in evaluating whether due process principles are satisfied as opposed to analyzing minimum contacts with any one state or local forum. (*See* Section "IV,A,1, c.")

### i. Hoechst AG's Contacts With The United States As A Basis For Exercising General Jurisdiction

General jurisdiction over Hoechst AG is proper given Hoechst AG's continuous and systematic contacts with the United States. The Court takes judicial notice of the multiple

---

[40] In support of its due process argument, Defendant Hoechst AG proffers multiple declarations from Dr. Thomas Kuehlhorn.

(unrelated) Hoechst AG cases cited by Plaintiffs – particularly those civil actions in which <u>Hoechst AG accepted responsibility for similar illegal conduct within the United States</u>.  (*See* Parkdale Pls.' Mem In Opp'n at 8-10 / Exhs. 6-8.)  These cases reveal that Hoechst AG has a significant presence within the United States and has  purposefully availed itself of the benefits and protections of American law such that it could reasonably expect to be involved in United States litigation.

Moreover, in most of the cases cited by NCPs where Hoechst AG ultimately pled guilty or entered into settlement agreements, Hoechst AG consented to the exercise of personal jurisdiction – just as it has apparently done in the related action pending in the Southern District of New York.[41] Hoechst AG's agreement to submit to one or more other federal jurisdictions within the United States is an appropriate consideration in this case.  *See* <u>Secs. and Exch. Comm'n v. Lines Overseas Mgmt., Ltd.</u>, 2005 WL 3627141, *6 (D.D.C.)

In this context, Hoechst AG's due process argument carries little weight.  *See generally,* <u>Hogue v. Milodon Eng'g, Inc.</u>, 736 F.2d 989, 991 (4th Cir.1984); <u>In re Cardizen CD Antitrust Litig.</u>, 105 F.Supp.2d 618, 675 (E.D.Mich.2000) (noting "the confluence of the increasing nationalization of commerce and modern transportation and communication" as resulting in more relaxed limits on due process requirement) (*internal citations omitted*).

---

[41] In 2003, a related civil action was commenced in the Southern District of New York by Arteva entities including its parent, Koch Industries, Inc., against the Hoechst Celanese entities.  *See* SDNY Civil Docket No.: 1:03CV8679.  Hoechst AG and Celanese AG have <u>not</u> challenged personal jurisdiction in the SDNY civil action.  According to Arteva / KoSa's complaint, both "either expressly or impliedly consented to personal jurisdiction."  (SDNY Action Compl. ¶18)

### ii. Relationship Between Hoechst AG, Trevira, and Its American Subsidiaries As A Basis For Exercising General & Specific Jurisdiction[42]

Personal jurisdiction of Hoechst AG may also be established as a result of its subsidiaries' "minimum contacts" with the forum. In re Auto. Refinishing Paint Antitrust Litig., 2002 WL 31261330, *10-11 (E.D.Pa.)(July 31 2002). "Typically, a foreign corporation is not subject to personal jurisdiction "merely because of its ownership of the shares of stock of a subsidiary doing business in the state." "In re Auto. Refinishing Paint, 2002 WL 31261330, *10. "There are several lines of cases, however, discussing when the contacts of a subsidiary may be imputed to the parent under an alter ego theory when direct contacts between the parent and forum are absent." Id.

Under an alter ego theory, plaintiff is required to show that "the degree of control exercised by the parent must be greater than normally associated with common ownership and directorship." In re Auto. Refinishing Paint, 2002 WL 31261330, *10. "Plaintiff[] must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." Id. In engaging in this inquiry, the court is directed to "examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary to assess whether the contacts of the subsidiary [with the forum] should be imputed to the parent." Id.

Factors other courts have considered include "whether the parent has the capacity to influence the subsidiary's major business decisions, whether the parent and subsidiary have the same officers and directors, whether the parent and subsidiary maintain separate books and accounts, whether an integrated sales system exists between the parent and subsidiary, and whether the parent and subsidiary present a common marketing image." Smithfield Foods, Inc., 332 F.Supp.2d at 62

---

[42] Again, the Court distinguishes this inquiry from a traditional veil-piercing analysis to determine substantive liability.

(*internal citations omitted*); <u>In re Auto. Refinishing Paint</u>, 2002 WL 31261330, \*10 (identifying "the common use of a trademark or logo" and "the interchange of managerial and supervisory personnel," among others, as potential factors demonstrating parental control); *See also* <u>In re Magnetic Audiotape Antitrust Litig.</u>, 334 F.3d 204, 208 (2nd Cir.2003).[43]

Moreover, in the absence of more traditional factors, some courts have held that where two or more corporate entities have formal separate structures *but maintain unified operations*, the corporate form may be disregarded. *See generally*, <u>Leach Co. v. Gen. Sani-Can Manuf. Corp.</u>, 393 F.2d 183, 186 (7th Cir.1968) (corporate separateness properly disregarded **for purposes of jurisdiction, venue, and service** despite the *absence* of overlap between owners, directors and officers and separate books and records, where one entity was mere agent for the other).

The existence or absence of any single factor is not determinative, as the analysis is driven by the facts of the particular case. <u>FMC Fin. Corp. v. Murphree</u>, 632 F.2d 413, 422 (5th Cir.1980) (whether corporate entity may be disregarded to impute liability depends upon the circumstances in each case).

According to Hoechst AG and Dr. Kuehlhorn, the North American polyester staple business was "operated and controlled on a day-to-day basis" by Hoechst AG's indirect subsidiary, Hoechst Celanese - not Hoechst AG. (Kuehlhorn Reply Decl. ¶4) The record evidence indicates otherwise.

---

[43] In <u>In re Magnetic Audiotape Antitrust Litigation</u>, the Second Circuit remanded to the district court to consider plaintiff's allegations that American subsidiary's contacts with the United States should be imputed to the parent for purposes of general personal jurisdiction. <u>In re Magnetic Audiotape Antitrust Litig.</u>, 334 F.3d 204, 208 (2nd Cir.2003). A few of the same factors are relevant here, such as whether there was overlap in executive personnel between the companies, and whether the parent and subsidiary shared resources and infrastructure.

Hoechst AG created Trevira to conduct its worldwide fibers operations, which was managed and treated as one business unit. Harris explained that Trevira was formed to run "the worldwide [fibers] business, including the North American business without focusing on the national corporate legal entities in each jurisdiction." (NCPs' Exh. 13 / Harris Dep. at 72.) Harris is quoted from August 1996 explaining that prior to1994, Hoechst AG's business was operated on a country by country basis with each country a profit center," and how the business was restructured to provide for multiple divisions, "each with worldwide responsibility." (Harris Dep. at 70-71.) Because Hoechst had global customers doing business in more than one region, the focus was shifted to products as opposed to geographic location. (Harris Dep. at 66.) The reorganization reflects an intent on the part of Hoechst AG to disregard geographic barriers to marketing and selling its PSF product worldwide.

The way Hoechst AG / Trevira elected to market itself and its PSF businesses undermines Defendant's argument that personal jurisdiction is lacking. The Trevira trademark adopted by Hoechst AG was a successful marketing tool for the promotion of Hoechst AG's worldwide fibers business. (NCPs' Exh. 37A) Trevira held itself out as operating production facilities in North and South America, Europe, Africa and Asia.[44] (Id.) In its 1996 SEC 10-K filing, Hoechst Celanese touts its polyester staple and filament as "commonly recognized by their *Trevira*® trademark." (Id.) The benefits of Trevira's integrated sales and marketing plan is specifically mentioned in a shareholders' report issued by CelCan early in 1997. (Id.) ("Our partnership with the Hoechst Group continues to pay significant dividends through shared technology and competitive access to broader markets."; "Benefits of being a part of this [Hoechst Group] team can be summed up in one word:

---

[44] The same marketing media (whether via website or print) indicates that Trevira had a local office located at 2300 Archdale Drive, in Charlotte, North Carolina. (Id.)

Access.  Access to world markets.  Access to best-in-class technologies.  And access to world-scale opportunities.")

Trevira's Leadership Committee / Board was comprised of Hoechst AG leadership and effectively controlled by Hoechst AG.   In addition to Harris's testimony, NCPs present minutes from various meetings held in 1996 and 1998.  Hoechst AG contends that the materials produced by Plaintiffs relate *solely to Trevira* as they represent *Trevira's* meeting minutes as opposed to any Hoechst AG meeting.  For the reasons already set forth, Defendants' explanation is inadequate.  Hoechst AG's position is based in part on the documents' failure to identify the Hoechst AG entity in the description of the minutes.[45]   Rather than focusing on the manner in which any particular meeting was contemporaneously described by Defendants' leadership, or the way a meeting is now being characterized by the litigants, the Court, to the extent the record allows  it,  looks to the participants and their respective roles, as well as the items discussed and actions taken to assess the relationship between Hoechst AG and Trevira.   In other words, the Court rightly focuses on substance as opposed to form.  *See generally* Oksanen, M.D. v. Page Memorial Hosp., 945 F.2d 696, 703 (4th Cir.1991) (examining the substance, rather than the form, of the relationship between hospital and medical staff for purposes of §1 Sherman Act liability) (*citing* Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769-774 (1984))[46]; Ins. Co. v. Bank, 181 S.E.2d 799, 805

_____

[45]   The first two sets of meeting minutes, from June and July 1996, are titled, "Fibers Leadership Committee Meeting."  The August 1996 meeting minutes are titled, "Trevira Leadership Committee Meeting."  The October 1996 and December 1996 meeting minutes are both titled, "Trevira Board Of Directors Meeting."

[46]   In Copperweld, the Supreme Court held that a parent corporation and its wholly owned subsidiary are not capable of conspiring together for purposes of Section 1 of the Sherman Act.  Copperweld Corp., 467 U.S. at 769-774.   It is the Supreme Court's rationale that is of interest here.  While generally addressing the aligned interests between a larger corporate structure and an organizational division within the structure, the court commented that the two are indistinguishable in

(N.C. App.1971) ("A court of equity seeking to do justice among all parties looks to the spirit and not the form of transactions . . . It regards corporate organization objectively and realistically, unencumbered by fictions of corporate identity, and thus, brushing aside form, deals with substance . . . Corporate identity offers no bar to equity's pursuit of the "plumb line" of right dealing and fair accounting.")

Plaintiffs contend that many of these meetings were attended by multiple Hoechst AG officers and directors, including Messrs. Mische, Bieber, Hirschberg, Langer, and others. According to Dr. Kuehlhorn, only one of the persons that attended the Trevira Board meetings was an actual Hoechst AG employee - Mr. Mische. Kuehlhorn represents that Mische's attendance was "in his function as a member of the management board of directors of Hoechst AG, providing general guidelines on policy issues affecting the fibers businesses on behalf of the ultimate shareholder of the Hoechst group companies owning those businesses." (Kuehlhorn 2/5/07 Decl. ¶8) In other words, Mische was there representing Hoechst AG's interests. If Mische were the only Hoechst AG officer or director present, the Court's analysis might be different. Kuehlhorn does not explain why so many others attended the Trevira meetings. Kuehlhorn states that the other twenty-three individuals Plaintiffs refer to as Hoechst AG officers and directors "worked at the relevant time for one or more Hoechst group entities organized under Trevira, the Hoechst group fibers business, not Hoechst AG." (Id.) The fact that Defendant claims the leadership committee or board members (or participants) had dual roles does not preclude the Court from considering their contributions, nor does it require a finding that the Hoechst AG officers and directors were only present in their

---

many respects based upon the "unity of purpose and common design" that already exists given the relationship. Id. For this reason, in reaching its conclusion, the Supreme Court ultimately looked to the interests of the entities, many of which were common, regardless of the formal corporate structure.

capacity as employees of other Hoechst group entities.  In re Auto. Refinishing Paint, 2002 WL

31261330, *10 ("the primary factor that precludes a finding of alter ego jurisdiction . . . is the lack

of representation of BASF AG on BASF Corporation's board of directors.")  Although the record

is not fully developed on this point, Plaintiffs present sufficient evidence of overlap between the

Hoechst AG officers and directors and the Trevira Leadership Committee / Board.

The nature of the decisions made by Trevira's Leadership Committee / Board likewise

provide evidence of the symbiotic relationship between Hoechst AG and Trevira.  More specifically,

the types of action taken at these meetings include the following:  decisions to close down certain

production lines and explore the possibility of shutting down an entire manufacturing facility, the

identification of individual candidates for leadership positions within the business, the approval of

Hoechst Celanese's capital budget, and decisions regarding incentive compensation.   (Harris Dep.

at 115.)  The minutes document a future presentation by Harris to a committee of the Hoechst Board

as well as a Smith presentation to "Hoechst Board SMP Committee."  (10/96 Minutes, ¶1(i);  8/96

Minutes, ¶1)  The meeting minutes are replete with references suggesting the need for the approval

of Mr. Mische, or Mr. Hirschberg, both of whom are in Hoechst AG director or officer leadership

roles.  (6/96 Minutes, ¶8b; 7/96 Minutes, ¶4a; 10/96 Minutes, ¶1h2)  These facts tend to show that

the management personnel within Hoechst Celanese and Trevira  regularly sought approval from

Hoechst AG on matters beyond strategy and general business policy.

The creation of Trevira and its Leadership Committee / Board does not insulate Hoechst AG

simply because Hoechst AG asserts that the decisions governing the PSF business were made at the

Trevira level rather than Hoechst AG.   It is the Court's view that Trevira was merely an arm of

Hoechst AG tasked with the responsibility of operating Hoechst AG's worldwide fibers business,

including Hoechst Celanese and Hoechst Corp., as efficiently as possible.

### iii. Conclusion

As already discussed, *supra*, Hoechst AG, through Trevira, exerted sufficient control, in a systematic and continuous manner, over its United States PSF business operations to justify the exercise of general jurisdiction. (*See* Section "III,A") Therefore, Hoechst AG's purposeful availment of the United States' benefits and protections is established via Hoechst AG's / Trevira's direct involvement as well as its relationship with its subsidiaries.

For all of the reasons discussed herein, the Court finds that exercising personal jurisdiction over Hoechst AG comports with both the statutory requirements of Section 12 of the Clayton Act as well as Fifth Amendment's Due Process requirements.[47] Hoechst AG's motion to dismiss for lack of personal jurisdiction will be <u>denied</u>.

## 2. Exercise Of Personal Jurisdiction Over Defendant Celanese AG / Waiver

The Court finds that Celanese AG waived its personal jurisdiction defense by failing to seek timely relief from the Court on this basis. "Personal defenses, such as lack of jurisdiction [over the person], may be deemed waived for failure to timely raise the defense, by formally submitting oneself to the jurisdiction of the court, or by "submission through conduct."" <u>United States ex rel. Combustion Syss. Sales, Inc. v. Eastman Metal Prods. and Fabricators, Inc.</u>, 112 F.R.D. 685, 687 (M.D.N.C.1986) (*quoting* <u>Neirbo Co. v. Bethlehem Shipbuilders Corp.</u>, 308 U.S. 165, 168 (1939)). Even after a Rule 12(b)(2) defense has been formally raised in an answer, waiver may be implied

---

[47] While the Court does not need to discuss Plaintiffs' alternative basis for exercising personal jurisdiction, many of the same facts also support application of North Carolina's long-arm statute.

"by conduct and inaction, such as entering an appearance, filing motions and requesting relief, or participating in hearings or discovery." United States ex rel. Combustion Syss. Sales, Inc., 112 F.R.D. at 687 (*internal citations omitted*); *See also* Burton v. N. Dutchess Hosp., 106 F.R.D. 477, 481 (S.D.N.Y.1985) (asserting lack of personal jurisdiction in answer without filing motion for the court's determination does not preserve the defense in perpetuity); *But see* Rates Tech. Inc. v. Nortel Networks Corp., 399 F.3d 1302, 1309 (Fed. Cir.2005) (substantial participation necessary in order to find waiver by conduct after personal jurisdiction defense asserted in answer).

### a. Celanese AG Answered Avondale's Second Amended Complaint In 2005 Without Pursuing Rule 12(b)(2) Motion

Celanese AG was first named as a Defendant in this litigation when Avondale amended its complaint on April 5, 2004 to include Celanese AG. On March 31, 2005, Celanese AG answered Avondale's Second Amended Complaint, acknowledging service.[48] (3:03CV296 / Document #33 at 6.) While Celanese AG asserted lack of personal jurisdiction as its Fourth Affirmative Defense, Celanese AG did not submit a motion or memorandum of law in support of any of its affirmative defenses at that time. Nor did Celanese AG ever move for dismissal on this basis in the Avondale action by submitting a separate motion and memorandum of law in support. *See* W.D.N.C. LCvR. 7.1.

---

[48] In January 2005, the Court authorized Avondale's request for appointment of an international process server. (3:03CV296 / Document #30) Neither party filed a separate "Notice," "Waiver" or "Acknowledgment of Service" verifying that service was effected upon Celanese AG in accordance with the Hague Convention. Accordingly, there is nothing in the court file indicating whether Celanese AG was ever formally served by Avondale as required by the Hague.

Celanese AG asserted insufficiency of service of process as its Third Affirmative Defense, stating that the Second Amended Complaint was "served upon Defendant nearly ten months later than the time allowed by the May 5, 2004 Court order granting Plaintiff leave to file the Second Amended Complaint." Celanese voiced no objection based upon any alleged deficiency under the Hague.

During the pendency of the Avondale action, Celanese AG, along with the other Hoechst Celanese Defendants, issued written discovery and responded to written discovery. (NCPs' Exhs. 3, 4) In addition, the Hoechst Celanese Defendants noticed multiple depositions and served subpoenas in order to accomplish third-party discovery. According to NCPs, the Hoechst Celanese Defendants deposed the following persons: David Poole (deposed 2-17-06); Larry Deas and Hector Camberos of DAK; Walt Goldman, Pedro Haas, George Gregory Achim Heyer, Ken Hardin (deposed 9-28-05) and Ray Kilminster of KoSa, and DAK's corporate representative. (NCPs' Exh. 1) NCPs also identify Richard Osman, Jim Casey, Troy F. Stanley, Jr., and Avondale Mills and its employees as subject to notices or cross-notices for deposition issued by Hoechst Celanese. (NCPs' Opp'n at 8 n. 4.) Celanese AG, through counsel, appeared along with the other Hoechst Celanese Defendants at depositions and examined witnesses. (NCPs' Exh. 2)

Celanese AG's current position with respect to Avondale is unclear. In its pending motion seeking dismissal of the Burlington Industries' action, Celanese AG does not expressly argue for dismissal of Avondale's claims against it.[49]

---

[49] Defendant's filings reference Avondale:

1) "With respect to the Second Amended Complaint filed by Avondale Mills on April 5, 2004 (the "Avondale Complaint"), Celanese AG similarly asserted the lack of personal jurisdiction at the earliest possible juncture – as an affirmative defense in connection with its timely-filed answer – and its limited participation in discovery in other MDL actions with its domestic affiliate co-defendants does not constitute a waiver of its defense of lack of personal jurisdiction."

2) "Because defendants are permitted to engage in discovery while simultaneously objecting to jurisdiction, Celanese AG's participation in discovery in MDL 1516 does not constitute a waiver of Celanese AG's jurisdictional objections, even in the Avondale action."

(Def.'s Reply at 3-4, 7.)

### b. Hoechst Celanese Defendants Retained New Counsel In 2006

In 2005, when Celanese AG answered Avondale's Second Amended Complaint, the law firm of Kaye Scholer, LLP ("Kaye Scholer"), represented the Hoechst Celanese Defendant group. Under Kaye Scholer's watch, Defendants were sanctioned for fairly egregious discovery abuse. The Court essentially determined that Defendants' search for discoverable materials and minuscule production during the first three years of litigation was wholly inadequate. (6-13-06 Hr'g Tr. at 44-52.) Defendants were compelled by the Court to produce a Rule 30(b)(6) corporate representative knowledgeable on the specific topics identified by NCPs and approved by the Court. (Id. at 44.) Defendants were also directed to comply with outstanding discovery requests of the NCPs. (Id. at 44-52.)

In April of 2006, roughly six months prior to the commencement of the Burlington Industries' and Parkdale Mills' consolidated actions, attorneys with Kasowitz, Benson, Torres & Friedman, LLP ("Kasowitz Benson"), began to file notices of appearance. A comparison of the filings submitted on behalf of the Hoechst Celanese Defendants *before* April 2006 with those submitted *after* April 2006 reveal that the latter documents are careful to preserve the jurisdictional defenses asserted by Hoechst AG and Celanese AG, while the earlier filings do not expressly do so.[50] The most glaring example can be found within Defendants' *Corrected* Motion For Summary Judgment with respect to Coats American to exclude the references to Hoechst AG that were "inadvertently included in the original motion" and request that "[a]ll references to Hoechst AG in the papers submitted supporting the motion" be disregarded. (Document #453) It appears the law

---

[50] Burlington Industries does not contend counsel for Celanese AG entered a general appearance for purposes of waiver.

firm of Kaye Scholer had a different strategy than Kasowitz Benson and, therefore, fully intended to submit to the jurisdiction of the Court.[51]

### c. Commencement Of The Burlington Industries' Action In 2006 Triggered Rule 12(b)(2) Motion By Celanese AG

The Burlington Industries' Plaintiffs commenced their civil action in September 2006. Celanese AG was served by the Burlington Plaintiffs in March 2007.  On April 2, 2007, Celanese AG moved for dismissal of the Burlington Industries' claims, in part, based upon the absence of *in personam* jurisdiction.

The Burlington Plaintiffs argue that Celanese AG waived the right to challenge the exercise of personal jurisdiction by participating in discovery prior to the commencement of the Burlington action in 2006.   Celanese AG admits participating in discovery along with its domestic affiliates within MDL 1516 (as opposed to the Burlington action) but denies it waived the right to challenge personal jurisdiction.  (Celanese AG's Reply at 6-8.)   According to Defendant, Celanese AG was served with discovery requests "collectively," or along with its subsidiaries, and it did not wish to risk discovery sanctions or exclusion from the discovery process in the event its jurisdictional challenge was not successful.[52]

### d. Waiver Analysis

Despite engaging in discovery over a two-year period, Celanese AG contends that it

---

[51] While there are surely others, one explanation for such a strategic decision could be to avoid litigating personal jurisdiction where Celanese AG had already agreed to indemnify Hoechst AG for any illegal conduct related to the PSF business occurring after the demerger.

[52] At the June 2006 hearing where the Court dealt with many of the discovery disputes and NCPs' motion for sanctions, counsel announced his appearance "for the Hoechst Celanese Defendants" and made no mention of Celanese AG specifically.  (6-13-06 Hr'g Tr. at 4.)  When the Court issued its decision orally, defense counsel did not object on behalf of Celanese AG based upon its assertion of the lack of personal jurisdiction defense in the Avondale action. (Id. at 44-52.)

preserved its jurisdictional challenge by raising the issue within its Answer to Avondale's Second Amended Complaint. *See* FED. R. CIV. P. 12(h)(1))(B).[53] The Seventh Circuit rejected a similar defense argument in <u>Cont'l Bank, N.A. v. Meyer</u>. *See* <u>Cont'l Bank, N.A. v. Meyer</u>, 10 F.3d 1293, 1296-97 (7th Cir.1993). In <u>Cont'l Bank</u>, defendants raised the defense of lack of personal jurisdiction within their answer but participated in litigation of the merits for over two and a half years without actively contesting personal jurisdiction. The Seventh Circuit held that given defendants' participation in discovery, and their filing and opposing various motions, the district court could properly conclude that defendants' delay in urging the court to decide the threshold issue of personal jurisdiction manifested an intent to submit to the court's jurisdiction. <u>Cont'l Bank</u>, 10 F.3d at 1297. The Seventh Circuit determined that defendants' literal compliance with Rule 12(h)(1) was not compelling under the facts of the case.

In evaluating waiver, the Court examines all of the relevant circumstances. *See* <u>Matthews v. Brookstone Stores, Inc.</u>, 431 F.Supp.2d 1219, 1224 (S.D.Ala.2006) ("the cases are far from uniform . . . the result seems to turn on the particular circumstances of an individual case.") (*quoting* <u>Epperson v. Entm't Express, Inc.</u>, 338 F.Supp.2d 328, 334 (D.Conn.2004)). In a case arising out of the Southern District of Alabama, another district court suggested the waiver-by-conduct analysis take into account 1) "the length of time that elapses between service of process and a defendant's pursuit of a personal jurisdictional defense via a Rule 12(b)(2) motion"; and 2) "the extent of the objecting defendant's involvement in the action." <u>Matthews</u>, 431 F.Supp.2d at 1224-1225.

---

[53] Rule 12(h)(1) of the Federal Rules of Civil Procedure provides that "[a] defense of lack of jurisdiction over the person . . . is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course." FED. R. CIV. P. 12(h)(1))(B).

Consequently, the Court looks to the length of delay and the extent of Celanese AG's involvement to date.

Defendant's failure to act over a two-year period is more than a sufficient lapse of time to support a finding of waiver. In this case, Celanese AG answered Avondale's Second Amended Complaint **two years** before moving to dismiss the Burlington Industries' action via Rule 12(b)(2) motion.[54] Celanese AG failed to pursue its jurisdictional defense between March 2005 and April 2007. During this period of time, Celanese AG never once requested relief from the Court based upon the alleged jurisdictional deficiency. Matthews, 431 F.Supp.2d at 1224 ("The longer the time interval, the more likely it is that courts will find a waiver . . . .") (*internal citations omitted*).

The true level of Defendant's participation in the proceedings is less clear. Celanese AG admits to "limited participation" in merits discovery within MDL 1516.[55] (Defs.' Reply Exh. A) However, all of the discovery requests propounded, and responses thereto, were served on (or on behalf of) multiple parent - subsidiary entities collectively rather than on Celanese AG individually.[56] (NCPs' Exhs. 3, 4) Likewise, Celanese AG's participation in deposition discovery was collective and somewhat passive. *See* Matthews, 431 F.Supp.2d at 1225 ("The more active a defendant has

---

[54] To the extent Celanese AG imparts that its conduct in the Avondale action or within the multi-district litigation as a whole has no bearing on the waiver analysis asserted by Burlington Industries with respect to their individual action, the Court rejects Defendant's position. *See* Matthews, 431 F.Supp.2d at 1224.

[55] According to Defendant, unlike Avondale, Burlington Industries never sought discovery from Celanese AG.

[56] The fact that Celanese AG's participation thus far has been in conjunction with the other Hoechst Celanese Defendants is recognized by NCPs. In their response, the Burlington Industries Plaintiffs state: "Through the same counsel jointly representing all of the Hoechst Celanese Defendants, Celanese AG appeared in the MDL 1516 with the filing of its Answer on March 29, 2005 to Avondale Mills' Second Amended Complaint." (Pls.' Opp'n at 7.)

been in litigating a case, the more likely it is that the defendant will be deemed to have waived defects in personal jurisdiction and impliedly consented to a court's jurisdiction.") Because Celanese AG acted in conjunction with the other Hoechst Celanese Defendants, if the Court's analysis were based *solely* on the degree of Celanese AG's involvement, the Court would be hard-pressed to find waiver.[57]

Celanese AG claims that even if the Court were to find it waived the right to challenge personal jurisdiction in the Avondale action, its earlier alleged waiver does not warrant a finding of waiver in the subsequent action. The Court disagrees. All of the cases within MDL 1516, including the Burlington Industries' action, were consolidated for pretrial proceedings pursuant to 28 U.S.C. §1407. Therefore, to the extent possible, the various individual actions should be treated and managed as one.[58] *See* MANUAL FOR COMPLEX LITIGATION § 20.131 (4th ed. 2004) ("The objective of [Section 1407] transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts.") To that end, upon the filing of the 2006 civil actions and NCPs'

---

[57] Neither party provides the Court with instructive legal authority addressing the evaluation of a litigant's participation in proceedings where its conduct in discovery is more of a concerted or collaborative effort. The Clark case cited by Celanese AG references "joint" statements submitted to the court, but does not engage in any discussion about the significance of joint action in a waiver analysis. *See* Clark v. City of Zebulon, 156 F.R.D. 684, 694 (N.D. Ga.1993) (no post-answer waiver of Rule 12(b)(5) defense where defendant entered into settlement negotiations prior to the filing of a responsive answer, sought and received an extension of time in which to file its answer without reserving the defense, actively participated in discovery after filing answer, and participated fully with the other parties in the drafting of joint statements to be filed with the court pursuant to the Local Rules.)

[58] The Court does not suggest that Section 1407 transfer alters an analysis of personal jurisdiction over any given defendant. *But see* MANUAL FOR COMPLEX LITIGATION § 20.13 (4th ed. 2004) (authority of the Judicial Panel on Multidistrict Litigation is not subject to venue restrictions) (*citing* In re N.Y. City Mun. Sec. Litig., 572 F.2d 49 (2nd Cir.1978)). However, it is certainly a relevant circumstance.

identification of the cases as related to MDL 1516, the litigants became immediately subject to all of the Court's previous rulings and were directed to obtain discovery in the most efficient manner possible, including sharing discoverable materials already produced and exchanged by other MDL 1516 litigants. Avondale and the Burlington Industries' Plaintiffs are all NCPs prosecuting their own individual claims either by way of a single or consolidated complaint. The factual allegations within each of the NCPs' complaints are nearly identical. The NCPs' actions are also coordinated by a court-appointed Liaison Counsel for the NCPs. In this context, Celanese AG's position regarding a waiver limited in scope is not persuasive.

### e. Conclusion

Celanese AG's decision to postpone formally seeking relief based upon lack of personal jurisdiction may be deemed a waiver of the issue. Admittedly, the facts here are not as strong as in <u>Cont'l Bank</u>, where defendants filed and opposed various motions in addition to participating in discovery. However, the Seventh Circuit's rationale applies with equal force – a litigant's decision to sit on its rights indefinitely is entirely inconsistent with a Rule 12(b)(2) threshold challenge claiming lack of personal jurisdiction. In other words, Celanese AG's own inaction is fatal to its current jurisdictional challenge. While Celanese AG did not formally waive its personal jurisdiction defense as contemplated by Rule 12(h)(1), the Court finds that waiver is implied.

## V. Order

**IT IS, THEREFORE, ORDERED THAT:**

1) Defendants' Rule 12(b)(2) Motion is **DENIED** as to Hoechst AG;

2) Defendants' Rule 12(b)(2) Motion is **DENIED** as to Celanese AG;

3) Defendants' Motion To Strike NCPs' Surreply (Document #634) is **DENIED**.

Signed: April 1, 2008

Richard L. Voorhees
United States District Judge